THOMPSON v. HARPER.

5-641 279 S. W. 2d 277

Opinion delivered May 16, 1955.

[Rehearing denied June 13, 1955.]

48

*H. B. Stubblefield, W. J. Dungan* and *Campbell &
Campbell,* for appellant.

*Wood, Chesnutt & Smith* and *Clayton Farrar,* for
appellee.

ED. F. McFADDIN, Justice. This is a suit brought by
appellees who claim a commission as real estate brokers.
In rendering judgment, the Chancery Court necessarily
found: (a) that appellees had a valid and enforcible
contract with appellants; (b) that appellees had not
abandoned the contract; and (c) that appellees were the
procuring cause of the sale of the property. On this
appeal, several questions are argued; but we find it nec-
essary to consider only one point: that the appellees had
abandoned whatever contract they formerly possessed.

The Broadway Hotel Company, a corporation,
owned certain property in Hot Springs: part of the
property was operated as a hotel and part was rented
for stores and offices. The appellees, Frank Harper
and Charles Hughes, rented an office from the corpora-
tion and operated a real estate brokers' partnership
known as "Hot Springs Realty Company." In January,
1952, the Broadway Hotel Company duly filed its Cer-
tificate of Dissolution in Garland County; and the three
Directors named in the said Certificate were Vance M.
Thompson, B. F. Lewis and Mrs. B. F. Lewis. By force
of law (§ 64-807, Ark. Stats.) these three Directors be-
came Trustees of the corporate property. They are the
appellants in this case. B. F. Lewis continued to oper-
ate the Broadway Hotel for the benefit of the former
stockholders.

In early April, 1953, B. F. Lewis told appellees,
Harper and Hughes, that the Broadway Hotel Com-
pany's property was for sale; and that he thought the

property would be sold for $50,000 cash. Lewis signed no contract with the appellees. They were to get an offer and transmit same to Lewis who was then to submit the offer to the other parties interested with Lewis.[1] All of the "other parties" do not appear to have been named, but appellees understood that Vance M. Thompson was one such party interested with Lewis.

Shortly after the above conversation, appellees reported to Lewis that E. D. Murphy would buy the property for $65,000 provided (a) Murphy's home was taken as $15,000 payment and (b) the balance of $50,000 was to be paid $10,000 cash and $40,000 in deferred payments secured by vendor's lien note or first mortgage. Lewis agreed to submit this offer to Mr. Thompson; and in a few days Lewis advised appellees, Harper and Hughes, that there could be no deal made. Here is Appellee Harper's testimony as to this final conversation with Lewis:

". . . he informed me that he didn't think Mr. Murphy had enough money and he didn't think they would be interested in it. A little later on, a few days later on, I met him on the street and I asked him what he was going to do about it, if he was going to do anything about it, and he said no, Mr. Thompson wouldn't go along with him, so he let Mr. Thompson have all his interest in the hotel, so he sold out to him.

"Q. Mr. Lewis sold to Mr. Thompson?

"A. Yes.

"Q. Did you have any further dealings with Mr. Murphy after that?

"A. No, I didn't have any further dealings with Mr. Murphy after that."

---

[1] Here is Lewis' testimony as to the so-called "listing": "Well, one day I was passing the real estate office and Mr. Harper was there and I just remarked 'I believe I'm getting just about ready to quit the hotel business and if you ever have anybody that was interested in the hotel to get an offer and then I would submit it to the owner, Mr. Thompson, and if they wanted to sell, so far as I'm concerned we could sell it, that I was ready to stop,' and that was when I told him I couldn't list it with him that I didn't have any authority to list the hotel."

Also here is Appellee Hughes' version as to the final conversation[2] with Lewis:

"Q. You knew about Mr. Lewis? You heard his testimony that he said forget about everything, everything was off, some few days after you had this discussion with him?

"A. Yes, he said that. . . .

"Q. I am talking about Mr. Lewis said forget about it, did you contact them any more or have any further conversation with the Murphys after that?

"A. Yes, I did. . . .

"Q. Now, that was after they had already purchased it?

"A. Yes, sir.

"Q. In other words, you didn't talk to either Mr. Murphy or Mrs. Murphy after Mr. Lewis said for you to forget about it until after Mr. Murphy had already purchased the hotel from Mr. Thompson?

"A. That's right."

Lewis' testimony is to like effect:

"A. I told Mr. Harper that Mr. Thompson wouldn't take $50,000 and to just forget the whole thing, that I had washed my hands of it, that I wasn't going to have any more to do with it, and so far as I was concerned, I would continue to operate it."

After this conversation the appellees dissolved their real estate brokers' partnership. Appellee Harper had nothing further whatsoever to do with Hughes or the Broadway Hotel Company's property. Appellee Hughes went to Alabama on a trip and did nothing further in regard to the Broadway Hotel property. We emphasize that Lewis signed no contract with the real estate brokers; that they had no listing of the Broadway Hotel

[2] These questions and answers are taken from Hughes' discovery deposition which is in the record. Hughes testified to the same effect at the trial.

property for any definite time; that any offer they got they were to submit to Lewis and he to submit it to Thompson; and that when Lewis notified appellees of Thompson's rejection of the offer, appellees did what Lewis suggested—*i. e.,* they forget the entire matter.

Some time after the quoted conversation and, presumably, while Hughes was on his trip to Alabama, Murphy sought out Lewis in order to locate Thompson; and Murphy went to McCrory, Arkansas, to see Vance M. Thompson and there closed a deal with him for the purchase of the Broadway Hotel property for $60,000, being payable: $9,308.08 cash; first mortgage notes on some California property for $8,691.92; and the balance of $42,000 evidenced by vendor's lien note on the Broadway Hotel property. After Appellee Hughes returned from Alabama he learned of the sale of the Broadway Hotel property by Thompson to Murphy. No demand for real estate commission was ever made by either of the appellees: instead they filed this suit on July 3, 1953, for $15,000 as claimed real estate commission. Equity jurisdiction was invoked because the defendants, Thompson, B. F. Lewis and Mrs. B. F. Lewis, were by law (§ 64-807, Ark. Stats.) trustees of the Broadway Hotel property.

We have repeatedly held that a real estate broker's contract need not be in writing. See *Long* v. *Risley,* 208 Ark. 608, 188 S. W. 2d 132, and cases there cited. We have also held that when the owner sells the property even after the expiration of the real estate broker's contract, the owner is liable to the real estate broker for the commission if the broker was in fact the procuring cause of the sale. See *Hartzog* v. *Dean,* 216 Ark. 17, 223 S. W. 2d 820. But in the case at bar whatever kind of contract the appellees had regarding the Broadway Hotel property was entirely abandoned by them. Lewis told them they could "forget the whole thing" and they thereupon considered the matter entirely ended. Harper did nothing and Hughes went to Alabama. When Murphy went to see Thompson he did not tell Thompson that Hughes or Harper or anyone else had anything to do with the property; and Thompson testified that he did not know

of the connection of either of the appellees with the property. Lewis testified that Harper and Hughes had no contract and were not the procuring cause of the sale.

In 8 Am. Jur. 1069, in discussing the effect of abandonment on the part of the broker, the holdings are summarized in this language:

"If a broker, after introducing a prospective customer to his employer to no purpose, abandons his employment entirely, or if, after procuring a person who proves to be unwilling to accept the terms of his principal, he merely ceases to make further endeavors to negotiate a deal with that particular individual and all negotiations in that direction are completely broken off and terminated, he will not be entitled to a commission if his employer subsequently renews negotiations with the same person, either directly or through the medium of another agent, and thus effects a sale without further effort on the part of the broker first employed."[3]

In an Annotation in 9 Ann. Cas. 435 many cases are cited to sustain this statement:

"If a broker does not procure a purchaser on the terms authorized and he abandons further efforts to sell to a prospective purchaser, or if negotiations between the broker and the purchaser are completely broken off and terminated, the broker will not be entitled to a commission if the owner subsequently enters into negotiations with the same party and effects a sale."

The rules stated in the foregoing quotations are completely applicable to the case at bar; and find inferential support in our own holdings. Our cases, while factually different nevertheless, recognize the rule that abandonment of the contract by the broker leaves the owner free to act without being liable for a commission. See *Stogsdill* v. *Holmes*, 144 Ark. 574, 169 S. W. 961;

---

[3] Annotations listing the cases supporting the quoted textual statement are contained in: 9 A. L. R. 1194; 12 A. L. R. 2d 1367; 27 A. L. R. 2d 1402; 44 L. R. A. 346, 613; 16 L. R. A. (N. S.) 432; 139 A. S. R. 231; 9 Ann. Cas. 435; Ann. Cas. 1913D, 824; and Ann. Cas. 1913E, 788.

*Johnson* v. *Knowles,* 169 Ark. 1089, 277 S. W. 868; and *Oliver* v. *Dent,* 207 Ark. 843, 183 S. W. 2d 302. We conclude that the appellees abandoned whatever contract that might have been originally made, and therefore they are not entitled to any recovery.

Reversed and dismissed.

Chief Justice SEAMSTER not participating.

Justice HOLT dissents.